```
 1                    IN THE UNITED STATES DISTRICT COURT

 2                      FOR THE DISTRICT OF DELAWARE

 3

 4    BAXALTA INCORPORATED, BAXALTA    )
      US INC., and NEKTAR             )
 5    THERAPEUTICS,                   )
                                      )
 6                    Plaintiffs,     )
                                      ) C.A. No. 17-1316-RGA-SRF
 7    v.                              ) CONSOLIDATED
                                      )
 8    BAYER HEALTHCARE, LLC,          )
                                      )
 9                    Defendant.      )

10

11                                  Friday, August 28, 2020
                                    2:01 p.m.
12                                  Pretrial Videoconference

13
      BEFORE:  THE HONORABLE RICHARD G. ANDREWS, U.S.D.C.J.
14

15    APPEARANCES:

16              RICHARDS LAYTON & FINGER, P.A.
                BY:  FREDERICK L. COTTRELL, III, ESQUIRE
17              BY:  KELLY E. FARNAN, ESQUIRE

18                        -and-

19              HAUG PARTNERS LLP
                BY:  ED HAUG, ESQUIRE
20              BY:  RICH KURZ, ESQUIRE
                BY:  SANDY KUZMICH, ESQUIRE
21
                                    For the Plaintiffs
22

23

24

25
```

```
 1

 2    APPEARANCES CONTINUED:

 3              MORRIS NICHOLS ARSHT & TUNNELL LLP
              BY:  RODGER D. SMITH, II, ESQUIRE
 4
                        -and-
 5
              SIDLEY AUSTIN LLP
 6            BY:  JIM BADKE, ESQUIRE
              BY:  SONA DE, ESQUIRE
 7            BY:  CHING-LEE FUKUDA, ESQUIRE
              BY:  LAUREN C. KATZEFF, ESQUIRE
 8
                                  For the Defendant
 9

10

11                  ***  PROCEEDINGS  ***

12            THE COURT:  Hello, Mr. Smith.

13            MR. SMITH:  Hello again, Your Honor.

14            THE COURT:  Good afternoon.  I just say hello to

15    you because your picture is in front of me and because I've

16    already chatted with you once today.

17            All right.  So this is the scheduled pretrial

18    conference in Baxalta vs. Bayer, Civil Action Number

19    17-1316.

20            I see my deputy clerk on the line.  I see my

21    court reporter on the line.  I guess I should check.  Well,

22    I see them on the line.

23            And let's see, Mr. Smith, you represent the

24    defendant.  And I do not see, but perhaps Ms. Farnan or

25    Mr. Cottrell, one of them is on the line for the plaintiff?
```

1      MR. COTTRELL:  Yes, Your Honor.  I don't know

2  whether you can see me, but can you hear me?

3      THE COURT:  I cannot only hear you,

4  Mr. Cottrell, I can see you.

5      MR. COTTRELL:  Well, the former is much better

6  than the latter, Your Honor, but thank you.  Fred Cottrell

7  for the plaintiff, Baxalta, and Ms. Farnan is on from

8  Richards Layton.  And our co-counsel are on this afternoon

9  from Haug Partners, Ed Haug, Sandra Kuzmich, and Rich Kurz.

10      MR. HAUG:  Good afternoon, Your Honor.

11      MR. KURZ:  Good afternoon, Your Honor.

12      MS. KUZMICH:  Good afternoon, Your Honor.

13      THE COURT:  All right.  And so Mr. Smith, again,

14  nice to see you again.  Who do you have on your side on the

15  line?

16      MR. SMITH:  Your Honor, Rodger Smith from Morris

17  Nichols for Bayer, the defendant here.  I'm joined by my

18  co-counsel from Sidley Austin, Jim Badke, Sona De, Ching-Lee

19  Fukuda, and Lauren Katzeff.

20      THE COURT:  Okay.  Well, good afternoon to

21  everyone.  So I did look at the joint proposed pretrial

22  order.  I can't say that I have done a whole lot on this

23  because I read the pretrial order, and it's pretty clear

24  that right now the case is in a position where it's

25  untriable, and the pretrial order is practically unreadable.

1    And the 1,500 pages of exhibits that went along with it were

2    filed in three undifferentiated entries on the docket making

3    it a chore to try to find motions in limine.

4              So there's not a lot that we can accomplish

5    today.  I did look at it enough to know that, in my opinion,

6    you both have to do some serious reduction of your cases.

7    And what seemed to me to be the case is that probably

8    plaintiff ought to get down to ten claims.  The defendant

9    ought to get down to three defenses.

10              And I say three defenses, I don't necessarily

11   know whether the Bossard family has different defenses than

12   the Bentley family, but basically three defenses per family.

13   And if you use a defense against one family, but it's not

14   one of your three against the other, then you can't use it

15   for that.  I'm hoping, obviously, that you can get it down

16   to three that cover both sets of patents, but that may or

17   may not be possible.

18              And I also have a date where I could put you on

19   the calendar in, I think, about March.  Actually, yeah,

20   March 15th.  But I'm certainly not going to put you in the

21   calendar in any concrete way until I see some evidence that

22   the case could actually be tried.

23              I'm aware, of course, that you have pending a

24   lot of things that are sitting with me.  I will get to them

25   when I can.  But the one thing that I was curious about, and

1    it was kind of flagged because the Federal Circuit today

2    issued an inventorship opinion, and so I was wondering -- so

3    the defendants, as I understand it, filed a motion and now

4    are trying to amend the pleadings to correct inventorship.

5    And the basic argument is that if they were successful, they

6    would basically throw the plaintiff out of court.

7         And so I understand the plaintiff opposes the

8    motion and the amendment of the pleadings, and I take it

9    that probably one ground of opposition is it's too late.

10   But I'm wondering, let's assume for the sake of argument

11   it's not too late, is there an argument that you can only

12   correct inventorship by a pleading, or can you correct

13   inventorship by a motion?

14        So I'm thinking that perhaps the Haug partners

15   would be answering this question.

16        MR. HAUG:  Well, good afternoon, Your Honor.

17   This is Ed Haug.  Well, obviously, it's not our motion to

18   correct the inventorship.  We think the inventorship is fine

19   the way it is.  And so they're trying to bring it into the

20   case.  We believe that if it does come into the case, number

21   one, there would be additional discovery required.

22        THE COURT:  No.  No.  Mr. Haug, you're going way

23   beyond my question right now.

24        MR. HAUG:  I'm sorry.

25        THE COURT:  My question is:  Let's assume it's

```
 1    timely and they can bring it into the case, can they bring

 2    it into the case by a motion?

 3              MR. HAUG:  It's a cause of action, so I think

 4    they can amend the pleadings on your assumption, Your Honor,

 5    that it's not too late, and they otherwise can bring it in,

 6    I think they could.  I would think they could on the

 7    pleadings.

 8              THE COURT:  Well, so I understand because I do

 9    see or I have seen it done by or, you know, done by

10    pleadings, so maybe I should be asking the Bayer people:

11    Can you do this by motion?

12              Have the Bayer people dropped off the line?

13              MR. HAUG:  I don't see them.  I see Mr. Smith.

14              MR. SMITH:  I believe I'm on and Ms. Katzeff is

15    on.  And there is a Sidley Austin participants listed, but

16    we can't hear or see them.  I can't, either.

17              THE COURT:  Well, I can't hear them.  I can't

18    see them.  I can see Ms. Katzeff, but I presume,

19    Ms. Katzeff, you are deferring to your other lawyers as to

20    answering this question; right?

21              MS. KATZEFF:  I am, Your Honor.  And I'm also

22    receiving a message from them that they can hear you, and

23    they are fixing their video and audio feed.

24              MS. FUKUDA:  Can you hear us now, Your Honor?

25              THE COURT:  All right.  Now, I can see the war
```

1    room of Sidley.  So can you do this by motion?

2                MR. BADKE:  Yes.  Yes, you can, Your Honor,

3    which is why we brought the motion.  It's a motion under

4    256, of course, and the statute provides that you can

5    correct inventorship by application motion to the District

6    Court.  And so, yes, we do believe you can do it by motion.

7                THE COURT:  Okay.  So what I understand is the

8    people that you want to add as inventors, they don't work

9    for Baxalta, or Nektar, or any of their predecessors.  Do

10   they work for Bayer or its predecessors, or do they work for

11   some third party?

12               MR. BADKE:  Well, we're looking, Your Honor, to

13   add two people.  One of them is Milan Tomic who was an

14   ex-Bayer employee.  He's the one who is the -- his work is

15   the basis for a number of defenses in the case, but we think

16   he should have been an inventor.  The other one is -- the

17   other inventor is Milton Harris who was the founder of

18   Nektar.

19               Now, what we allege in our motion, of course, is

20   that Milton Harris worked with Milan Tomic of Bayer back in

21   the early 1990s.  Information was communicated from Milan

22   Tomic to Milton Harris, and ultimately the information ended

23   up going to Nektar.  But in any event, our view is that

24   those two, and primarily Milan Tomic of Bayer, should have

25   been named as inventors.

1      THE COURT:  Well, because if it was Mr. Harris,

2  that's not going to get you anywhere on your standing

3  argument; is that right?

4      MR. BADKE:  Correct.  That's correct because we

5  don't have any rights.  We do have rights from Milan Tomic

6  who has assigned his rights to Bayer.

7      THE COURT:  Okay.  So is it your view, Bayer,

8  that both of these patent families and every asserted claim

9  Tomic should be an inventor on?

10      MR. BADKE:  Yes, Your Honor.  But under the law,

11  you only need 11 claims per patent to be -- in order to have

12  made a contribution to be named.  So our answer to the

13  question is, yes, but we don't -- it doesn't have to be

14  every claim.

15      THE COURT:  But if it's a claim that's not -- if

16  he's not an inventor on the asserted claim, because one of

17  the things that I just read is you do this claim by claim.

18  I guess your argument is if he's an inventor on anything of

19  it, even if the claim isn't the one that's being asserted,

20  that has something to do with the assignment of rights.  And

21  so he could be an inventor on the most trivial of or, you

22  know, the least important claim in the bunch and still knock

23  out the ability to assign it without -- is that your point?

24      MR. BADKE:  Yes.  Yes, that is our point, Your

25  Honor, and there is case law to support that.

1            THE COURT:  Well, it sounds plausible to me

2     which is as much as we're going to get today.

3            So is it Bayer's view that, assuming the motion

4     is timely, that then there would need to be an evidentiary

5     hearing on whatever the precise issues are raised in the

6     motion, whatever the precise bases is for claiming that he

7     should be an inventor, because I have the impression that

8     there are usually hearings on this sort of thing.

9            MR. BADKE:  Yes.  Yes, you are correct, Your

10    Honor.  There are usually evidentiary hearings, and yes, we

11    would think that an evidentiary hearing is appropriate here.

12           THE COURT:  And so besides from Mr. Tomic and

13    possibly Mr. Harris, who else would be witnesses at this

14    evidentiary hearing?

15           MR. BADKE:  Perhaps a couple of experts.  An

16    expert or two.  There might be some corroborating witnesses

17    from Bayer, but there's other witnesses who are third

18    parties such as Dr. Bentley, who is also an ex-Nektar

19    employee who's a third party.  He would probably appear by

20    tape, by video, but it would be a smaller cast of witnesses

21    than, obviously, we'd have at a jury trial.  Maybe two or

22    three witnesses, four witnesses possibly.

23           THE COURT:  I'm sorry.  That's four witnesses

24    total or four witnesses in addition to Mr. Tomic and

25    Mr. Harris?  I've lost track of your counting mechanism

1    here.

2              MR. BADKE:  I'm sorry.  I was a little bit less

3    than precise on that.  I would think that with those two, it

4    might be five witnesses, including those two.

5              THE COURT:  All right.  And so --

6              MR. BADKE:  I'm sorry.  I was just going to say

7    Harris, I would expect by tape because he's a third party.

8    I don't -- my guess is he wouldn't voluntarily appear.

9              THE COURT:  And are any of these witnesses that

10   you're talking about in Europe?

11             MR. BADKE:  No.  No, Your Honor.

12             THE COURT:  Okay.  And is it the case that

13   basically -- because one of the things that I think Baxalta

14   says is you would have to do discovery on these issues.  And

15   if you're talking about experts, presumably they would have

16   to write reports and have opinions about this, about

17   something.

18             And so Baxalta, I think, says, you know, it

19   would take quite a while to gear up for a hearing on

20   inventorship.  What do you have to say about that?

21             MR. BADKE:  Your Honor, I don't think that's a

22   valid concern or complaint.  This case really primarily has

23   revolved around our allegations under 102(g) prior invention

24   and 102(f) derivation.  The crux of the case really is our

25   allegation that they stole the technology from us.

1    Everybody who is available to be deposed, all the experts,

2    all the discovery that was needed to be taken on the

3    inventorship issue has been taken which is why we say that

4    the motion is timely because it really is derivative from

5    the other issues that have been in the case right from the

6    beginning.

7              They're well aware of this.  And in fact, one of

8    their allegations on inequitable conduct was that they filed

9    those patent applications knowing that Milan Tomic, for one,

10   was an inventor.  And so the issues all relate to each

11   other.  So no, we don't see any other discovery.  And if

12   there is something there, it's going to be pretty minor.

13             THE COURT:  Well, so Mr. Badke, are you saying

14   that in the context of inequitable conduct discovery, the

15   question of whether or not Mr. Tomic is an inventor has

16   already been an issue and has already been the subject of

17   discovery?

18             MR. BADKE:  Yes, I am, Your Honor.  And in fact,

19   it's also -- all of these issues have been covered in the

20   expert reports.

21             THE COURT:  All right.  So hold that thought.

22             Mr. Haug or your compatriots there, what do you

23   have to say about the assertion that essentially this issue

24   has already been discovered?

25             MR. HAUG:  Well, I would disagree with it for

1   sure.   There certainly have been depositions of many of

2   these witnesses that Mr. Badke is talking about, but those

3   depositions were not taken with the understanding that there

4   was an inventorship claim by Mr. Tomic or by anyone else.

5   Those questions were not asked.

6        At no time did Bayer ever say Mr. Tomic was an

7   inventor until well after all fact and expert discovery was

8   done in this case.   Hence, it goes to the timeliness issue.

9        THE COURT:   So let me just try to pinpoint here

10  because I could have sworn that Mr. Badke just said part of

11  their inequitable conduct allegations was that Mr. Tomic was

12  an inventor.

13       Do you disagree with that?

14       MR. HAUG:   I think I would say they applied that

15  in that motion in that attempt or the motion that they've

16  made to bring in inequitable conduct, but that, too, was not

17  discovered.   In other words, we didn't take discovery on an

18  inequitable conduct claim in this case.   That was brought in

19  or that filing was made by them on the last permissible day,

20  and Your Honor is aware of the report and recommendation on

21  that which is now before you.

22       THE COURT:   Only constructively aware of it.

23       MR. HAUG:   Okay.   But that's what it is.   Judge

24  Fallon granted the motion to strike, and that's been

25  objected to actually by both sides, to some extent, and so

1   that is before you.  But there hasn't been discovery on the

2   inequitable conduct claim either, and there is implicit -- I

3   would say it's implied in their papers that Mr. Tomic may be

4   an inventor, but it was more from the standpoint of a

5   derivation argument that they have had in this case.  Right.

6            And it was only after the inequitable conduct

7   motion they made that they now bring in or want to bring in

8   this inventorship question.  So it's even later in time that

9   they're trying to bring that in.

10           I also want to point out -- I think this is a

11  jury issue because it is a 102(f) derivation claim in this

12  case, and now there's an inventorship, correction of

13  inventorship claim under 256.  If it comes into the case, I

14  think that makes a jury issue under the Seventh Amendment.

15  So I don't think it's just an evidentiary hearing before the

16  Court on inventorship.

17           So as long as they have both of those claims in

18  the case, that would all go to the jury, if it's permitted

19  to come in at all, would be my position.  It is my position.

20  I heard Mr. Badke just, you know, mention --

21           THE COURT:  I'm sorry, Mr. Haug.

22           MR. HAUG:  Yes.

23           THE COURT:  The discussion of the Seventh

24  Amendment, is that in the papers that have been filed in

25  connection with this?

```
 1              MS. HAUG:  Yes, it is, Your Honor.

 2              THE COURT:  Okay.

 3              MR. HAUG:  Yes, it is.  So in any event --

 4              THE COURT:  I'm sorry, Mr. Haug.  You were going

 5    to say something else?

 6              MR. HAUG:  I'm hearing from Mr. Badke now pretty

 7    much on the fly in response to your questions that he may

 8    have four, or five, or so witnesses, fact, and then experts.

 9    Clearly, we would also -- I mean, in other words, there are

10    other inventors here.  We probably want to go back to those

11    inventors on the question of inventorship, whether or not

12    Mr. Tomic or Mr. Harris are co-inventors and of what.

13              So I mean, that was just not an issue.  That's

14    just not something that was at issue in this case.  And so

15    we have to go back over that and do the fact discovery and

16    the expert discovery that would be consistent with that.

17              THE COURT:  Okay.

18              MR. BADKE:  Your Honor, if I can add one thing.

19    I want to make sure that you or the Court understands the

20    timing here.  We filed the motion to amend on inequitable

21    conduct probably a month before the close of fact discovery,

22    and I have to say I was at a number of these depositions,

23    including Harris and Bentley, and including Harris was

24    deposed after we filed the inequitable conduct.  I was at a

25    lot of these depositions, and I can tell you their
```

1    questioning went directly to the inventorship issue.   They

2    completely understood that the inequitable conduct pleading

3    before the close of fact discovery does say that Tomic was

4    an inventor, and he was left off of the patent.   So they're

5    fully aware of this issue.

6              And plus, prior invention means he's an

7    inventor.   That defense was in from the very beginning of

8    the case.   So was derivation.   But prior invention means he

9    invented it, Tomic invented it before their people did.   The

10   inventorship issue has long been in this case.

11             THE COURT:   I'm sorry.   One of your defenses

12   from the get-go was "prior invention" meaning?

13             MR. BADKE:   Correct.   That is that Bayer and

14   specifically Dr. Tomic invented the subject matter of these

15   patents first.   That is that he invented the subject matter

16   of the patents back in the early 1990s working for Bayer,

17   that he disclosed it then to Dr. Harris who was working for

18   Nektar.   He was the founder of Nektar, and then ultimately

19   ten years later this information worked its way to

20   Dr. Bossard and Dr. Bentley.   And they filed their patent

21   applications, but it was based on information that they got

22   originally from Dr. Tomic.

23             And so on that basis from the beginning of the

24   case, we have asserted, A, that the patents are invalid

25   because of Dr. Tomich's and Bayer's prior invention, and B,

1    that they derived the invention from Dr. Tomic.   Both of

2    those issues implicate inventorship as does the inequitable

3    conduct quite directly.

4                THE COURT:  And the briefing on the motion

5    relating to inventorship or now the briefing on the amending

6    of, I guess, your answer, do they delve into all the things

7    I'm now talking to you about?

8                MR. BADKE:  I believe so, Your Honor.  Yes.

9    Yes, I believe that the briefing does talk about the fact

10   about what I just said which is that this whole subject of

11   inventorship has been in the case from the very beginning.

12   I mean, another way, Your Honor, to look at this, the motion

13   to correct the inventorship, it's really an alternative form

14   of relief to the inequitable conduct.  So if the Court finds

15   that they had deceptive intent in not naming Milan Tomic,

16   the Court can find that the patents are unenforceable.

17               However, the Court doesn't need to find intent

18   to deceive when it comes to motion to correct.  The Court

19   can simply find that Milan Tomic and Harris should have been

20   inventors without having to deal with the deceptive intent

21   issue.  So it's just different forms of relief pertaining to

22   the same facts.

23               THE COURT:  Okay.  All right.  I'm not sure, on

24   the question of the correction of inventorship, whether

25   there's any more understanding or progress that I can make

1    today.

2               MR. BADKE:  Your Honor, this might help maybe

3    facilitate one thought for you, and I just want to point it

4    out because Mr. Haug brought up the 102(f), that you can't

5    have 102(f), and it creates a Seventh Amendment issue.  If

6    the Court corrects inventorship, the case goes away.  If the

7    Court corrects inventorship, there's no 102(f) jury issue

8    left in the case because the case is over.  So they can

9    stand -- they don't have to -- they're not inconsistent.

10              And I personally spent eight years on a case

11   very similar to this, and we did the same thing.  We brought

12   a motion to correct inventorship before the trial, won that

13   motion, and the case just goes away.  That went up to the

14   Federal Circuit.  It was affirmed, you know, that there's no

15   standing at that point of the plaintiff to pursue the case.

16              THE COURT:  Okay.

17              MR. HAUG:  Your Honor, may I respond to that

18   quickly?

19              THE COURT:  Yes.

20              MR. HAUG:  This is Ed Haug.  First of all, the

21   whole point of the Seventh Amendment is to avoid exactly

22   what Mr. Badke just said which is have the Court decide

23   correction of inventorship, thereby the issue is resolved,

24   and there's no need to go to 102(f).  The reality is the

25   102(f) defense has been in this case since the beginning.

1    We've taken a lot of discovery on it.  It's always been

2    there.  It's always been Bayer's position that the patents

3    are invalid.

4            And only now after all is said and done, they

5    want to change horses.  They want to change their direction

6    and make this a correction of inventorship case so they get

7    rights under these patents which is inconsistent with the

8    whole position of invalidity of these patents.  And I mean,

9    as Mr. Badke said, if it's been in the case all along, why

10   did they have to file a motion to amend to bring it in?  The

11   reason is because it hasn't been in the case.  It hasn't

12   been discovered.  It hasn't been the focus of the case.

13           Derivation is a very different argument than

14   joint inventorship.  The law is different.  The facts are

15   different.  There are a lot of differences between that.

16           And so right now, as we sit here, I think they

17   want to have multiple shots at the target.  We've been

18   working for two-plus years since 2017 on this case.  It's

19   been a straight patent infringement case, and they have, I

20   don't know how many grounds of invalidity, but there are

21   many.  Over 20.

22           THE COURT:  Right.  So correction of

23   inventorship, is that a clear and convincing standard or is

24   that a preponderance of the evidence standard?

25           MR. HAUG:  I think it's clear and convincing.

1          MR. BADKE:  We think it's preponderance, Your

2     Honor.

3          THE COURT:  Well, you would disappoint me if you

4     agreed.  Okay.  All right.  So basically you know, I'd like

5     to tell you that I'm going to get right on this and figure

6     this out and let you know on Tuesday what I think about all

7     this.  That's probably not a promise I can make.

8          But what it does seem to me is that I ought to

9     sort of try to focus on these things that involve, well, I

10    guess, all the pending motions, but more particularly I am

11    going to prioritize looking at this correction of

12    inventorship issue.

13         And I guess the reason, Mr. Badke, why you also

14    have a motion to amend is that besides for correction of

15    inventorship, you want to add in three other defenses that

16    aren't presently in the case; is that right?

17         MR. BADKE:  No.  No.  No, Your Honor.  With all

18    due respect, that's not accurate.  All we're adding in is

19    just some additional language on the motion to correct which

20    is based on language we had in our original answer.  The

21    original, which as I said that inventorship was incorrect.

22    But because the other side complained that we didn't

23    actually put in our pleading a motion to correct

24    inventorship under Section 256, we thought that while we

25    were cleaning up the pleadings, the inequitable pleadings,

1    that we would just add that just for housekeeping.

2           So because I guess we would anticipate that the

3    Court might come back and say to us, well, you know, put

4    this in your pleading, the 256.  But it was -- inventorship

5    was originally there.  And so all we're doing is that we

6    don't think we need to do that, but we just thought that

7    that was good housekeeping, and that's all that we're trying

8    to add.

9           THE COURT:  Okay.  All right.  So basically I'm

10    going to try to move along things at my end and try to

11    figure out whether, you know, the correction of inventorship

12    should be in the case or not as essentially a means of

13    getting it standing.  And I'm going to tell you that I do

14    have two weeks, not that I would give you two weeks, but I

15    have two weeks available on March 15th of 2021.  For various

16    reasons, I don't have a whole lot of available times.

17           What I would like you all to do is talk to each

18    other about, you know, reducing the scope of the case along

19    the lines that I've suggested.  If either or both of you

20    want to file letters telling me that I'm violating your due

21    process rights, you can go ahead and do that.  You know, I

22    think there's a legitimate reason to be reducing both sides

23    of the case to your strongest arguments, not just everything

24    you can think of.

25           And depending on what happens with inventorship,

1    I would ask, at a minimum, but there's no reason to do this

2    right now, that you somehow or another get the motions in

3    limine in this case in a place where I don't have to go

4    around looking through hundreds of pages to find them.  And

5    I don't actually care about any of the attachments, just the

6    actual arguments.  And if I think a hearing on correction of

7    inventorship is an appropriate thing to do, I'll schedule

8    one.

9             Maybe if things go slowly, maybe I'll schedule

10   that for March 15th, but see if it turns out that we're

11   ready at the time.  You be ready or your witnesses would be

12   available for March 15th.  And if so, you know, write me

13   some sort of letter or something, and I'll at least put a

14   hold on the calendar for that time period.

15            Hold on here a minute.  At some point we're

16   going to have a renewed pretrial conference and, you know, I

17   hope at the time we might actually get a joint proposed

18   pretrial order that is not mostly just crosstalk between the

19   two of you.

20            So that's about it.  That's all I've got for

21   today.  Is there anything else you all want to discuss

22   today?

23            MR. BADKE:  Your Honor, just in terms of maybe

24   making a little bit more efficient our meet and confer in

25   terms of reducing the scope of the case, I'd like to just

1    raise one issue.  When Your Honor ordered that plaintiff

2    reduce its number of claims from 63 to 24, they did that.

3    But what's actually behind that is that they chose claims

4    that have multiple dependencies so that the 24 claims are

5    really 63, and so that did not materially reduce the scope

6    of the case.

7             So when Your Honor tells them to reduce it today

8    to ten, if they're picking claims that have multiple

9    dependencies and multiple different elements, that number

10   could actually be 30.

11            THE COURT:  No.  So Mr. Badke, I don't really

12   agree with your math.  I mean, after all, a dependent claim,

13   once you throw in the independent and the multiple

14   dependency limitations, it's just a claim with more than the

15   usual number of limitations.  And you know, I understand why

16   from an avoiding prior art perspective narrow claims are

17   good.  So you know, I can't, and I think it would be wrong

18   to say, okay, you can only pick independent claims or to

19   say, well, if you have four dependencies, that counts as

20   four claims.  So you know, I'm not sure what your point is.

21            MR. BADKE:  Well, I guess my point is that it

22   could be a factor, and we're not ready to discuss, it sounds

23   like, you know, how long the trial is.  But I guess my main

24   point for this is when they have that many, a lot of

25   dependencies and long claims, it just means it's harder for

1    us to reduce the amount of prior art that we need to show

2    the jury.  That's all.

3           But if --

4           THE COURT:  Well, so the amount of prior art,

5    that's not actually, I think, part of my complaint here.  My

6    complaint is you have like nine different -- I mean, it's

7    basically like you took the invalidity checklist and just

8    checked them all off and said, We've got one of each.  So

9    I'm less concerned about having, you know, background art or

10   having, you know, art that covers a dependent claim that

11   only appears in one asserted claim.  I don't think that's

12   the problem.  I think the problem is that you have every

13   defense in the book.

14          MR. BADKE:  Well, there's a lot wrong with these

15   patents, I will say, but Your Honor's point, Your Honor, I

16   understand.  Obviously, by the time we get to the jury

17   trial, we were anticipating that the number of claims would

18   be reduced dramatically from the 63 that they have up until

19   a couple weeks ago.

20          Yeah, we'll take a look at that, Your Honor, of

21   course.  And we'll, obviously -- I think, you know, as Your

22   Honor may recall, the last time, the last case we tried, we

23   complained about them having at the pretrial conference some

24   20 defenses or something like that.  We don't intend to go

25   into trial with 20 defenses.

1          THE COURT:  Right.  Well, I haven't forgotten

2    that, Mr. Badke, because I remember that when you filed your

3    motion for attorneys' fees, you mentioned that maybe more

4    than once.

5          And so I guess I'm not sure what the point is.

6    Your point is they engaged in sanctionable conduct, so now

7    that you've identified it as such, you should be able to

8    engage in it?

9          MR. BADKE:  No.  No, not at all, Your Honor.

10   All I'm saying is we are -- I meant what I said when I

11   complained about it.  We don't intend to go into trial with

12   20 defenses, but we were waiting for them to reduce their

13   claims so we can see what's in the case.

14         THE COURT:  Well, and I do think that -- and

15   that's part of the reason why you should be talking about it

16   because if it's the case that, you know, it's not

17   necessarily -- in fact, it's not.  I don't envision that I

18   think they should go from 24 to 10, and then you get to pick

19   which of your three.  I think you should sort of -- you

20   know, you have time to mutually reduce in force in something

21   that is relatively fair in terms of you getting rid of your

22   weaker ones and them getting rid of their either weaker ones

23   or their unnecessary ones.

24         MR. BADKE:  We would welcome such a reduction,

25   Your Honor, very much.  So we'll work hard at that.

```
1                  THE COURT:  All right.

2                  MR. HAUG:  Your Honor, this is Ed Haug.  We will

3      certainly engage in that meet and confer.  As I think Your

4      Honor is aware, we did cut down to 24.  At ten claims, we

5      have ten patents in this case still, so that's one claim per

6      patent.

7                  So we have to look at how we can really do that

8      or get close to that, and we're going to do that.  But I do

9      think it has to be a two-way conversation with the defendant

10     here on all their defenses because --

11                 THE COURT:  Right.  So both of you are now

12     saying the same thing which is the right thing to be saying.

13     You know, the proof will be in the pudding.

14                 MR. HAUG:  Correct.

15                 THE COURT:  Okay.  Is there anything else

16     anybody else wants to talk about today?

17                 MR. HAUG:  Just so I'm clear, Your Honor, the

18     March 15th date, I know it's maybe in pencil mark, but based

19     on your schedule and based on what you're going to do with

20     the inventorship issue, we're going to tell our people that

21     right now tentatively it's a March 15th trial date.  Can we

22     do that?

23                 THE COURT:  Yes.

24                 MR. HAUG:  Okay.  Thank you.  And right now the

25     pretrial order says seven days.  That comes from the
```

1   original Rule 16 conference.

2            THE COURT:  Right.

3            MR. HAUG:  Should we be assuming seven days or

4   something less?

5            THE COURT:  No.  You know, I told you -- you

6   know, one of the great prerogatives of being a judge is you

7   can change your mind, and people can only mutter off in the

8   distance.  But, no, I did tell you I would give you seven

9   days for this, and that is my plan.

10           But one of the things that was my take on the

11  first trial, and I forget exactly how long that actually

12  lasted, is, notwithstanding everything, you all tried to get

13  in too much stuff in the time allotted.  And I think that

14  really hurts in terms of having a jury understand what it is

15  you're trying to do.

16           And so one of the things that I am hopeful of is

17  that in seven days, with a reasonable number of claims and a

18  reasonable number of defenses and ones that you've prepared

19  for, not ones that you found out in the middle of trial,

20  this is what it's going to be, that you'll be able to do a

21  better job of -- or sorry.  That's not what I meant to say.

22  That the jury will be deluged with less information and have

23  a better chance to appreciate the finer points of your

24  arguments which I'm sure will be quite fine.  So that's what

25  I'm trying to do.

1          MR. HAUG:  Thank you, Your Honor.  That will be

2   great.  Just that last trial was five days and one

3   difference, of course, was we had damages in that case,

4   also, which we don't here.

5          THE COURT:  Right.  Well, so I think you can do

6   this.  I think you can do this.

7          Anything else you want to talk about today?

8          MR. HAUG:  Not for plaintiffs.  Thank you, Your

9   Honor.

10          THE COURT:  Or Bayer?

11          MR. BADKE:  Not for Bayer, Your Honor.  Thank

12   you, Your Honor.

13          THE COURT:  Okay.  All right.  Well, so I will

14   try to not let this linger too much longer at least on the

15   inventorship and some of these clean-up proceedings and try

16   to get some direction from me here.

17          All right.  Well, listen, thank you for your

18   time today.  Sorry that we can't be a little more

19   productive.  And let me know if it turns out that, for one

20   reason or another, March 15th is a date that does not work

21   for you or at least does not work for you based on present

22   circumstances.

23          I forget, do either of you have witnesses from

24   Europe?

25          MR. BADKE:  Yes.  Yes, Your Honor.  Bayer does.

1     Also, our client is in Europe.

2            THE COURT:  Well, work on the assumption that on

3     March 15th they're going to be able to travel to the United

4     States.  If it turns out that assumption is wrong, and it

5     looks like it's wrong and we're looking like we're having a

6     trial in March, you know, contact me in December or

7     something.

8            Because one of the things -- Mr. Smith has

9     already heard this today.  If the only problem with the

10    trial is that some of the witnesses won't be able to travel

11    here -- I mean, hopefully that's not the way things will be

12    in March -- you know, I think there's alternatives to

13    postponing the trial that would need to be considered such

14    as agreeing that they can testify live via video from Europe

15    or agreeing that they're going to be unavailable so you can

16    do a trial deposition to get what you want from them in

17    testimony.  But that's a ways off, and hopefully it won't be

18    necessary.

19           All right?

20           MR. HAUG:  Thank you, Your Honor.

21           THE COURT:  Thank you, all.  Take care.  I'll be

22    hanging up now.

23           (Everyone said, Thank you, Your Honor.)

24           (Pretrial Videoconference was concluded at 2:44

25    p.m.)

1              I hereby certify the foregoing is a true and

2      accurate transcript from my stenographic notes in the

3      proceeding.

4                          /s/ Heather M. Triozzi
                           Certified Merit and Real-Time Reporter
5                          U.S. District Court

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25