**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| BAXALTA INCORPORATED, | ) | |
| BAXALTA US INC., and | ) | |
| NEKTAR THERAPEUTICS, | ) | |
| | ) | |
| Plaintiffs and | ) | |
| Counterclaim Defendants, | ) | |
| | ) | |
| v. | ) | Civil Action No. 17-1316-RGA-SRF |
| | ) | |
| BAYER HEALTHCARE LLC, | ) | |
| | ) | |
| Defendant and | ) | |
| Counterclaim Plaintiff. | ) | |

## REPORT AND RECOMMENDATION

### I.    INTRODUCTION

Presently before the court in this patent infringement action are the motions of plaintiffs Baxalta Incorporated, Baxalta US Inc. (together, "Baxalta"), and Nektar Therapeutics ("Nektar") (collectively, "Plaintiffs") to dismiss and strike certain counterclaims and affirmative defenses in defendant Bayer Healthcare LLC's ("Bayer") second and fourth amended answer and counterclaims, respectively.[1]  (D.I. 622; D.I. 625)  For the following reasons, I recommend that the court DENY Plaintiffs' motions to dismiss and strike.

### II.    BACKGROUND

Plaintiffs and Bayer have developed and launched a number of factor VIII replacement therapies in the United States to treat hemophilia A, which is a congenital bleeding disorder

---

[1] The briefing and filings associated with the pending motions can be found at D.I. 623, D.I. 624, D.I. 626, D.I. 627, D.I. 643, and D.I. 653.  On December 7, 2018, the court entered an order consolidating Civil Action No. 17-1316-RGA with Civil Action No. 18-1355-RGA, with Civil Action No. 17-1316-RGA serving as the lead case.  (D.I. 132)  The two sets of pleadings presently before the court are the result of the consolidation of the two Civil Actions.

characterized by defective coagulation of the blood resulting from a deficiency in factor VIII protein. (D.I. 281 at ¶ 63)  In this consolidated patent infringement action, Plaintiffs allege that Bayer's Jivi® product infringes two families of patents owned by Plaintiffs: the Bossard Patents[2] and the Bentley Patents.[3]  (D.I. 281 at ¶ 66; C.A. No. 18-1355-RGA, D.I. 1 at ¶ 29)  Plaintiffs initiated the infringement action regarding the Bossard Patents on September 15, 2017.  (D.I. 1)  On August 31, 2018, Plaintiffs filed another complaint against Bayer, alleging that Bayer's Jivi® product infringes the Bentley Patents.  (C.A. No. 18-1355-RGA, D.I. 1)  On September 4, 2019, Plaintiffs filed the operative second amended complaint against Bayer in Civil Action No. 17-1316-RGA-SRF, alleging that Bayer's Jivi® product infringes the Bossard Patents.  (D.I. 281)

In response to Plaintiffs' allegations of infringement in the above-referenced pleadings, Bayer filed its inequitable conduct, unclean hands, and *Walker Process* antitrust claims in October and November 2019.  (D.I. 333; D.I. 381)  Plaintiffs then filed a motion to dismiss Bayer's pleadings.  (D.I. 383)  The undersigned judicial officer issued a Report and Recommendation on July 13, 2020, recommending that the Court grant-in-part the motion to dismiss based on certain specified deficiencies in the pleadings.  (D.I. 494)  The parties filed objections to the Report and Recommendation, (D.I. 504; D.I. 505), and Bayer also moved to amend its pleadings on August 4, 2020, (D.I. 515).  The following month, the Court terminated

---

[2] The Bossard Patents include U.S. Patent Nos. 7,199,223 ("the '223 patent"); 7,863,421 ("the '421 patent"); 8,143,378 ("the '378 patent"); 8,247,536 ("the '536 patent"); 8,519,102 ("the '102 patent"); 8,618,259 ("the '259 patent"); 8,889,831 ("the '831 patent"); and 9,999,657 ("the '657 patent").  (D.I. 281 at ¶ 1)

[3] The Bentley Patents include U.S. Patent Nos. 7,026,440 ("the '440 patent"); 7,872,072 ("the '072 patent"); 8,273,833 ("the '833 patent"); 8,809,453 ("the '453 patent"); and 9,187,569 ("the '569 patent").  (C.A. No. 18-1355-RGA-SRF, D.I. 1 at ¶ 1)  The '440 patent is the parent of the '072, '833, '453, and '569 patents.  (D.I. 607 at ¶ 76)  Plaintiffs waived their assertion of the '440 patent after the deposition of its lead inventor, Dr. Michael Bentley.  (*Id.* at ¶ 75)

Bayer's motion to dismiss, the Report and Recommendation, and the objections to the Report and Recommendation as moot due to the filing of the motion to amend. (D.I. 591)

In December 2020, the undersigned judicial officer held oral argument and issued a Memorandum Opinion and Order granting Bayer's motion to amend. (D.I. 604) In January 2021, Plaintiffs filed objections to the Memorandum Opinion and the pending motions to dismiss Bayer's amended pleadings regarding the Bentley and Bossard Patents. (D.I. 621; D.I. 622; D.I. 625) Plaintiffs' motions to dismiss are the subject of this Report and Recommendation.

## III.    LEGAL STANDARDS

### A.    Rule 12(b)(6)

Rule 12(b)(6) permits a party to move to dismiss a complaint for failure to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). When considering a Rule 12(b)(6) motion to dismiss, the court must accept as true all factual allegations in the complaint and view them in the light most favorable to the plaintiff. *See Umland v. Planco Fin. Servs., Inc.*, 542 F.3d 59, 64 (3d Cir. 2008). "Courts use the same standard in ruling on a motion to dismiss a counterclaim under Rule 12(b)(6) as they do in assessing a claim in a complaint." *Goddard Sys., Inc. v. Gondal*, C.A. No. 17-1003-CJB, 2018 WL 1513018, at *4 (D. Del. Mar. 27, 2018).

To state a claim upon which relief can be granted pursuant to Rule 12(b)(6), a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Although detailed factual allegations are not required, the complaint must set forth sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 663 (2009). A claim is facially plausible when the factual allegations

3

allow the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Iqbal*, 556 U.S. at 663; *Twombly*, 550 U.S. at 555-56.

The court's determination is not whether the non-moving party "will ultimately prevail," but whether that party is "entitled to offer evidence to support the claims." *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1420 (3d Cir. 1997) (internal citations and quotation marks omitted). This "does not impose a probability requirement at the pleading stage," but instead "simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of [the necessary element]." *Phillips v. Cty. of Allegheny*, 515 F.3d 224, 234 (3d Cir. 2008) (quoting *Twombly*, 550 U.S. at 556). The court's analysis is a context-specific task requiring the court "to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. 663-64.

Allegations of fraud are subject to the heightened pleading requirements of Federal Rule of Civil Procedure 9(b). *U.S. ex rel. Whatley v. Eastwick Coll.*, 657 F. App'x 89, 93 (3d Cir. 2016). Under Rule 9(b), a plaintiff must "state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). This heightened pleading standard was meant to "place the defendants on notice of the precise misconduct with which they are charged, and to safeguard defendants against spurious charges of . . . fraudulent behavior." *Seville Indus. Mach. Corp. v. Southmost Mack Corp.*, 742 F.2d 786, 791 (3d Cir. 1984). Accordingly, the complaint must provide "all of the essential factual background that would accompany 'the first paragraph of any newspaper story'—that is, the 'who, what, when, where, and how' of the events at issue." *Whatley*, 657 F. App'x at 93 (quoting *In re Rockefeller Ctr. Prop., Inc. Sec. Litig.*, 311 F.3d 198, 215 (3d Cir. 2002)). "The use of boiler plate and conclusory allegations will not suffice." *Kuhn*

4

*Constr. Co. v. Ocean & Coastal Consultants, Inc.*, 844 F. Supp. 2d 519, 530 (D. Del. 2012) (internal quotation marks and citations omitted). The heightened pleading requirements of Rule 9(b) apply to causes of action for inequitable conduct, unclean hands, and *Walker Process* claims. *See Senju Pharm.*, 921 F. Supp. 2d at 306 (applying Rule 9(b) standard to inequitable conduct); *Cephalon, Inc. v. Slayback Pharma Ltd. Liab. Co.*, C.A. No. 17-1154-CFC, 2019 WL 3497105, at *1 (D. Del. Aug. 1, 2019) (applying Rule 9(b) standard to causes of action for unclean hands based on allegations of inequitable conduct); *MedImmune, Inc. v. Genentech, Inc.*, 427 F.3d 958 (Fed. Cir. 2005), *rev'd on other grounds*, 549 U.S. 118 (2007) ("Like all fraud-based claims, *Walker Process* allegations are subject to the pleading requirements of Fed. R. Civ. P. 9(b).").

### B. Rule 12(f)

Plaintiffs move to strike Bayer's affirmative defenses for inequitable conduct, unclean hands, and *Walker Process* fraud based on the same allegations made in support of their counterclaims. The sufficiency of the affirmative defenses is evaluated under Rule 12(f), which provides that the court "may strike from a pleading any insufficient defense." Fed. R. Civ. P. 12(f). When a party fails to state a corresponding claim under Rule 12(b)(6), the court may strike the associated affirmative defense under Rule 12(f). *See Wyeth Holdings Corp. v. Sandoz, Inc.*, C.A. No. 09-955-LPS-CJB, 2012 WL 600715, at *4 (D. Del. Feb. 3, 2012) (citing *Power Integrations, Inc. v. Fairchild Semiconductor Int'l Inc.*, C.A. No. 08-309-JJF-LPS, 2009 WL 4928024, at *8-10 (D. Del. Dec. 18, 2009)).

## IV. ANALYSIS

### A. Inequitable Conduct

Plaintiffs move the court to strike Bayer's affirmative defenses and dismiss its amended counterclaims for inequitable conduct in the Bentley and Bossard actions.[4] (D.I. 623; D.I. 626) Inequitable conduct occurs when: (1) a specific individual with a duty of candor to the United States Patent and Trademark Office ("USPTO") fails to disclose information or makes an affirmative misrepresentation to the USPTO during prosecution of the patent application; (2) the misrepresentation or omission is material to the examiner's decision to allow the patent; and (3) the individual has the specific intent to deceive the USPTO. *See Therasense, Inc. v. Becton, Dickinson & Co.*, 649 F.3d 1276, 1287 (Fed. Cir. 2011); *Star Scientific, Inc. v. R.J. Reynolds Tobacco Co.*, 537 F.3d 1357, 1365 (Fed. Cir. 2008).

A pleading alleging inequitable conduct must satisfy the particularity requirements of Rule 9(b) by setting forth the "who, what, when, where, and how" of the material misrepresentation or omission. *Exergen Corp. v. Wal-Mart Stores*, 575 F.3d 1312, 1328 (Fed. Cir. 2009). Although Rule 9(b) permits general averments of malice, intent, knowledge, and other conditions of the mind, the pleading must allege sufficient underlying facts to support a reasonable inference that the party acted with the requisite state of mind. *Id.* at 1327. "The relevant 'conditions of mind' for inequitable conduct include: (1) knowledge of . . . the falsity of the material misrepresentation, and (2) specific intent to deceive the PTO." *Id.* (citing *Hebert v. Lisle Corp.*, 99 F.3d 1109, 1116 (Fed. Cir. 1996); *Molins PLC v. Textron, Inc.*, 48 F.3d 1172,

---

[4] Bayer's inequitable conduct affirmative defenses rise and fall with its inequitable conduct counterclaims. *See Senju Pharm. Co., Ltd. v. Apotex, Inc.*, 921 F. Supp. 2d 297, 306 (D. Del. 2013). Accordingly, I recommend that the court deny Plaintiffs' motion to strike the affirmative defenses for inequitable conduct to the extent that the counterclaims are upheld.

1181 (Fed. Cir. 1995)). "[I]n this district, an inequitable conduct claim is rarely disallowed at the pleading stage due to the failure to adequately allege scienter." *Zadro Prod., Inc. v. SDI Techs., Inc.*, C.A. No. 17-1406-WCB, 2019 WL 1100470, at *5 (D. Del. Mar. 8, 2019) (citing *Cornell Univ. v. Illumina, Inc.*, C.A. No. 10-433-LPS-MPT, 2016 WL 3046258, at *9 n.89 (D. Del. May 27, 2016)).

### 1. Scienter

According to Plaintiffs, Bayer's pleadings do not set forth sufficient facts to support a reasonable inference of either knowledge of the allegedly withheld references or a deliberate decision by Dr. Bentley, Dr. Bossard, Dr. Charles, Ms. Evans, Mr. Wilson, and Ms. Zhang to withhold or falsify material information with the specific intent to deceive the USPTO. (D.I. 623 at 6-10; D.I. 626 at 5-7) In response, Bayer contends that the court previously rejected the same arguments in the Report and Recommendation on the previous motions to dismiss and the Memorandum Opinion addressing the motion for leave to amend. (D.I. 643 at 6-7)

### (a) Knowledge of false or withheld information

Plaintiffs contend that Bayer's Bentley pleading does not plausibly allege that Dr. Harris, Dr. Bentley, Mr. Humphrey, Mr. Wilson, and Ms. Evans knew of Bayer's confidential information[5] and concealed it from the USPTO. (D.I. 623 at 4-6) With respect to the Bossard pleading, Plaintiffs similarly contend that Bayer pleads no facts supporting a reasonable inference that Dr. Bossard, Dr. Bentley, Ms. Zhang, Mr. Wilson, and Ms. Evans had actual knowledge of specific information regarding Bayer's confidential information, the Bailon[6] and

---

[5] Bayer's confidential information is alternatively called the "1990's Work" throughout the briefing. (D.I. 643 at 7-8; D.I. 653 at 4)

[6] Bailon, Pascal, *Rational Design of a Potent, Long-Lasting Form of Interferon: A 40 kDA Branched Polyethylene Glycol-Conjugated Interferon α-2a for the Treatment of Hepatitis C,*

Martinez[7] references, or the '440 patent and U.S. Patent No. 7,432,330 ("the '330 Nektar Patent"). (D.I. 626 at 8-10)

Bayer's operative Bentley and Bossard pleadings adequately allege knowledge of the false or withheld information for each of the named individuals. Knowledge may be averred generally at the pleading stage if the allegations are rooted in specific underlying facts in accordance with Rule 9(b). *See Exergen*, 575 F.3d at 1328, 11329 n.5; *see also Wyeth Holdings Corp.*, 2012 WL 600715, at *7. Here, the Bentley and Bossard pleadings recite specific facts from which the court can reasonably infer that each of the individuals knew of material information that was withheld from the USPTO.

With respect to Dr. Harris, the Bentley pleading specifically alleges that Shearwater supplied custom-made large, branched PEG molecules to Bayer in consultation with Dr. Harris, Shearwater's founder. (D.I. 607 at ¶ 19) The Bentley pleading asserts that Dr. Harris entered into a consulting agreement with Bayer, and Bayer disclosed its confidential research on factor VIII to Dr. Harris, including details of its pegylated factor VIII research such as attaching large PEG molecules at fewer binding sites to increase the half-life of factor VIII. (*Id.* at ¶¶ 20-22) Furthermore, the Bentley pleading establishes that the confidential information obtained from Bayer by Dr. Harris was but-for material to the prosecution of the Bentley Patents because it revealed "that factor VIII could be pegylated with a large, branched PEG that disclosed at least each limitation of claim 1 of the '440 Patent. . . ." (*Id.* at ¶ 78) These allegations, taken as true, give rise to a reasonable inference that Dr. Harris had knowledge of Bayer's confidential

---

BIOCONJUGATE CHEMISTRY, Vol. 12, No. 2, February 16, 2001, at 195. (D.I. 381, Ex. H) (the "Bailon reference").

[7] U.S. Patent No. 5,643,575 (the "Martinez reference").

information.[8]  Plaintiffs cite no authority in support of their position that these specific factual allegations must further be supported by documents or deposition testimony to survive a motion to dismiss at the pleading stage.  (D.I. 623 at 5)

Moreover, the Bentley and Bossard pleadings contain specific allegations regarding Dr. Bentley's knowledge.  The Bentley pleading alleges that Dr. Bentley learned of Bayer's confidential information, "including Bayer's use of large, branched PEGs," when he worked at Shearwater with Dr. Harris.  (D.I. 607 at ¶¶ 23-24, 30)  The Bossard pleading alleges that Dr. Bentley knew of the '330 Nektar Patent as a result of his role as vice president of research at Nektar and his work with the named inventors of the '330 Nektar Patent.  (D.I. 608 at ¶ 99)  Specifically, the Bossard pleading summarizes Dr. Bentley's deposition testimony that he was generally aware of the pegylation work performed by the named inventors of the '330 Nektar Patent, and he was specifically aware of the first named inventor's creation of a branched PEG containing two 20 kDa PEG branches attached to a lysine.  (Id.)  These allegations, viewed in the light most favorable to Bayer as the nonmoving party, give rise to a reasonable inference that Dr. Bentley knew of Bayer's confidential information and the '330 Nektar Patent.

---

[8] Plaintiffs argue that the portion of the January 19, 2021 Memorandum Opinion and Order on summary judgment addressing derivation of the asserted claims of the Bossard '536 patent disposes of Bayer's confidential information as § 102(f) prior art for anticipation and obviousness for the Bentley and Bossard Patents.  (D.I. 653 at 4 n.2 (citing D.I. 637))  Accordingly, Plaintiffs believe Bayer should withdraw its inequitable conduct allegations based on Bayer's confidential information.  (Id.)  But Bayer contends that the decision was limited to the asserted claims of the Bossard '536 patent, whereas the inequitable conduct allegations here are much broader, directed to patents and claims from both the Bossard and Bentley Patent families.  (D.I. 643 at 8 n.2)  Bayer's position is consistent with the state of the present record and the legal standards applicable to the pending motions.  In a subsequent decision on correction of inventorship, the District Judge recently emphasized the narrow scope of the ruling on derivation, noting that it "concerned only claims 16, 19, and 23 of the '536 Patent.  (D.I. 676 at 4 n.3)

The Bossard pleading adequately alleges that Dr. Bossard had knowledge of Bayer's confidential information, the '440 patent, the '330 Nektar Patent, and the Martinez reference. With respect to Bayer's confidential information, the Bossard pleading alleges that: (1) all scientists at Nektar knew of large PEGs and fewer binding sites, (D.I. 608 at ¶ 80); (2) Dr. Harris improperly disclosed Bayer's confidential information to the named inventors of the Bossard Patents, (*id.* at ¶ 122); and (3) during an August 6, 2003 meeting, Dr. Bossard learned that Bayer had performed its own research on pegylating factor VIII, with a preference for "bigger than 30 K branched PEGs," (*id.* at ¶ 145). Viewing these allegations in the light most favorable to Bayer, it is reasonable to infer that Dr. Bossard knew of Bayer's confidential information as a scientist at Nektar and a named inventor of the Bossard Patents who attended the August 6, 2003 meeting. The Bossard pleading also gives rise to a reasonable inference that: (1) Dr. Bossard knew of the Martinez reference based on her review of materials by Greenwald, a named inventor on the Martinez reference, (*id.* at ¶ 102); (2) Dr. Bossard learned of the '440 patent in her role as Director of Science and Technology at Nektar under the supervision of Dr. Bentley, the named inventor of the '440 patent, (*id.* at ¶ 103); and (3) Dr. Bossard knew of the '330 Nektar Patent in her role as Director of Science and Technology at Nektar, where she worked alongside the named inventors of the reference and specifically consulted with them on pegylation, (*id.* at ¶ 104). At this stage, the allegations are sufficient to give rise to a reasonable inference that Dr. Bossard had knowledge of the Martinez reference, the '440 patent, and the '330 Nektar Patent.

Plaintiffs argue that the Bentley and Bossard pleadings contain no facts establishing a plausible inference that Mr. Humphrey, Mr. Wilson, and Ms. Evans knew Bayer's confidential

information was related to the subject matter of the Bentley and Bossard Patents. (D.I. 623 at 6; D.I. 626 at 8) But the Bentley and Bossard pleadings highlight the roles of Mr. Humphrey, Mr. Wilson, and Ms. Evans as prosecution counsel, working directly with Drs. Bentley and Bossard to obtain the asserted Bentley and Bossard Patents despite the inventors' awareness that they did not actually discover the concept of fewer large PEGs or large branched PEG molecules on factor VIII. (D.I. 607 at ¶¶ 51-52, 77-78, 90; D.I. 608 at ¶¶ 80, 86) Drawing all reasonable inferences in favor of Bayer, it is plausible on these facts that prosecution counsel knew the named inventors of the Bentley and Bossard Patents did not discover or perform experimental work on the claimed subject matter, which instead was derived from Bayer's confidential information. (*Id.*) Although Plaintiffs challenge the specificity of the pleaded allegations regarding prosecution counsel, courts have recognized that the knowledge of the inventors and prosecution counsel often go hand in hand. *See Micron Tech., Inc. v. Rambus Inc.*, 917 F. Supp. 2d 300, 323 (D. Del. 2013) (noting the importance of considering "[n]on-public documents, such as notes or internal communications with patent prosecution counsel" to "shed light on the reasoning behind a decision to withhold" information during prosecution); *see also Novo Nordisk Pharms., Inc. v. Bio-Tech. Gen. Corp.*, 424 F.3d 1347, 1361-62 (Fed. Cir. 2005) (rejecting the defendant's argument that prosecution counsel's failure to disclose the truth about an example in the application should be excused by the inventors' failure to fully inform counsel of the details surrounding the example).

Plaintiffs contend that the Bossard pleading contains insufficient allegations that Ms. Zhang, an inventor of the Bossard Patents, had knowledge of Bayer's confidential information, the Martinez reference, the '440 patent, the '330 Nektar Patent, or the Bailon reference. (D.I.

11

626 at 8-10) The Bossard pleading alleges that all scientists at Nektar knew of large PEGs and

fewer binding sites by the late 1990's, and Ms. Zhang was a scientist at Nektar during the

relevant time period. (D.I. 608 at ¶¶ 73, 80, 105) The Bossard pleading further alleges that Drs.

Harris and Bentley violated their confidentiality agreements with Bayer regarding Bayer's

confidential information, and Dr. Harris improperly disclosed Bayer's confidential information

to the named inventors of the Bossard Patents. (*Id.* at ¶¶ 75, 122) It is reasonable to infer from

these allegations that Ms. Zhang learned of the use of large PEG molecules as a result of the

improper disclosure of Bayer's confidential information.

Moreover, the Bossard pleading adequately alleges that Ms. Zhang knew of the '440

patent and the '330 Nektar Patent because she worked with the named inventors of those patents,

and she is married to one of the named inventors of the '440 patent. (*Id.* at ¶¶ 108-109) The

allegation that Ms. Zhang knew of the Martinez reference because it was cited on the first page

of the '440 patent is also plausible. (*Id.* at ¶ 107) Bayer confirms that it does not accuse Ms.

Zhang of having knowledge of the Bailon reference in connection with the inequitable conduct

counterclaims. (D.I. 643 at 10 n.3)

Plaintiffs challenge the sufficiency of the allegations in the Bossard pleading regarding

Mr. Wilson and Ms. Evans' purported knowledge of the Martinez reference. (D.I. 626 at 10)

But the Bossard pleading plausibly alleges that Mr. Wilson knew of the Martinez reference

because it was cited by the Examiner in a rejection during prosecution of the '440 patent, and the

record establishes that Mr. Wilson received contemporaneous communications from Mr.

Humphrey attaching the office action and related amendments regarding the '440 patent. (D.I.

608 at ¶ 112) The Bossard pleading further establishes that Mr. Wilson would have reviewed the

12

file history of the '440 patent and learned of the Martinez reference while he was prosecuting a continuation of the '440 patent prior to the issuance of the Bossard '223 patent. (*Id.*) Similarly, the Bossard pleading plausibly alleges that Ms. Evans learned of the Martinez reference when she attended Dr. Harris' October 2001 deposition covering the alleged invalidity of the Martinez reference. (*Id.* at ¶ 117) The Bossard pleading also alleges that Ms. Evans knew of the '440 patent because it was assigned to Nektar and was prosecuted during the time she served as a patent agent at Nektar, and it shared a named inventor with the Bossard Patents on which she worked. (*Id.* at ¶ 118) At the pleading stage, these allegations are sufficient to give rise to a reasonable inference of Ms. Evans' knowledge of the Martinez reference and the '440 patent.

#### (b) Specific intent to deceive the USPTO

Plaintiffs contend that the Bentley and Bossard pleadings fail to plausibly allege that various individuals had a motivation and intention to deceive the USPTO to obtain issuance of the Bentley and Bossard Patents. (D.I. 623 at 6-10; D.I. 626 at 5-7) In the Bentley pleading, Plaintiffs challenge the sufficiency of the specific intent allegations with respect to Dr. Bentley, Ms. Evans, Mr. Humphrey, and Mr. Wilson. (D.I. 623 at 7-10) In the Bossard pleading, Plaintiffs challenge the sufficiency of the specific intent allegations with respect to Dr. Bentley, Dr. Bossard, Ms. Evans, Mr. Wilson, Dr. Charles,[9] and Ms. Zhang. (D.I. 626 at 5-7) Bayer responds that the court previously rejected these arguments, and Plaintiffs' arguments rest on factual disputes that cannot be resolved at the pleading stage. (D.I. 643 at 6-7)

The allegations in the Bentley and Bossard pleadings give rise to a plausible inference that each of the named individuals specifically intended to deceive the USPTO. *See Wyeth Holdings Corp. v. Sandoz, Inc.*, C.A. No. 09-955-LPS-CJB, 2012 WL 600715, at *7 (D. Del.

---

[9] Bayer does not accuse Dr. Charles of inequitable conduct. (D.I. 643 at 6 n.1; D.I. 494 at 23)

Feb. 3, 2012); *see also Exergen*, 575 at 1329 n.5 ("A reasonable inference is one that is plausible and that flows logically from the facts alleged."). At the outset, "[i]n this district, an inequitable conduct claim is rarely disallowed at the pleading stage due to the failure to adequately allege scienter." *Zadro Prods., Inc. v. SDI Techs., Inc.*, C.A. No. 17-1406-WCB, 2019 WL 1100470, at *4–5 (D. Del. Mar. 8, 2019); *see also Targus Int'l LLC v. Victorinox Swiss Army, Inc.*, C.A. No. 20-464-RGA-CJB, 2020 WL 7264199, at *5 (D. Del. Dec. 10, 2020), *report and recommendation adopted*, 2020 WL 7714592 (D. Del. Dec. 29, 2020). The alleged deficiencies identified by Plaintiffs reach the factual merits of the intent allegations, which is premature at this stage of the case.

As previously stated at § IV.A.1(a), *supra*, the Bentley and Bossard pleadings set forth specific allegations of the individuals' knowledge. The pleadings further allege that, despite this knowledge and their awareness of their obligations as patent applicants, each of the named individuals withheld the information when disclosure would have prevented the issuance of the Bentley and Bossard Patents and/or submitted false statements to the USPTO to obtain issuance of the Bentley and Bossard Patents. (D.I. 607 at ¶¶ 151-161; D.I. 608 at ¶¶ 139-151) On these facts, "it is reasonable to infer that an applicant who is aware of material prior art and the possible adverse effect that disclosure could have on the application would have an incentive to conceal the prior art." *Zadro Prods., Inc. v. SDI Techs., Inc.*, C.A. No. 17-1406-WCB, 2019 WL 1100470, at *5 n.4 (D. Del. Mar. 8, 2019); *see also EIS, Inc. v. WOW Tech Int'l GmbH*, C.A. No. 19-1227-LPS, 2020 WL 7027528, at *11 (D. Del. Nov. 30, 2020); *Lipocine Inc. v. Clarus Therapeutics, Inc.*, C.A. No. 19-622-WCB, 2020 WL 4794576, at *8 (D. Del. Aug. 18, 2020) (finding allegations that particular individuals involved in prosecution knew of potentially

14

invalidating prior art, selectively presented materials to examiner, and were motivated to conceal damaging prior art references were sufficient to satisfy the specific intent requirement under Rule 9(b)).

### 2. Duty of candor

Plaintiffs contend that Bayer fails to adequately plead that Dr. Harris owed a duty of candor to the USPTO. (D.I. 623 at 10-12; D.I. 626 at 10-12) According to Plaintiffs, Dr. Harris was not an inventor or prosecuting attorney for the Bentley and Bossard Patents in accordance with 37 C.F.R. § 1.56(c), nor was he substantively involved in the prosecution of those patents. (*Id.*) Bayer does not dispute that Dr. Harris was not a named inventor or prosecuting attorney of the Bentley and Bossard Patents. (D.I. 643 at 8-9) Therefore, the parties' dispute turns on whether the counterclaims adequately allege that Dr. Harris had a duty of candor stemming from his substantive involvement in the preparation or prosecution of the applications leading to the issuance of the Bentley and Bossard Patents.

Bayer's pleadings sufficiently state that Dr. Harris had a duty of candor because he was "substantively involved in the preparation or prosecution" of the applications leading to the issuance of the Bentley and Bossard Patents. 37 C.F.R. § 1.56(c)(3). The Federal Circuit has defined "'substantively involved' to mean that the involvement relates to the content of the application or decisions related thereto, and that the involvement is not wholly administrative or secretarial in nature." *Avid Identification Sys., Inc. v. Crystal Import Corp.*, 603 F.3d 967, 974 (Fed. Cir. 2010) (citing Manual of Patent Examining Procedures § 2001.01 (8th ed., rev.2, May 2004)).

The Bentley and Bossard pleadings recite a series of factual allegations illustrating Dr. Harris' substantive involvement in the prosecutions. Collectively, the allegations plausibly suggest that Dr. Harris supplied the inventive substance of the Bentley and Bossard Patents to the named inventors. In pertinent part, the Bentley pleading alleges that:

- Dr. Harris is a named inventor on the Harris/Bentley '237 patent, which discloses large branched PEGs having molecular weights up to 100 kDa and includes examples showing pegylation of a protein that includes 1, 2, and 3 PEGs. The non-provisional application leading to the issuance of the Harris/Bentley '237 patent was filed shortly after Dr. Harris' consultation for Bayer ended, and the pleading alleges that the Harris/Bentley '237 patent is based on confidential information Dr. Harris learned from Bayer, including Bayer's discovery of the efficacy of using fewer or branched large PEG molecules on factor VIII. The Bentley pleading alleges that the Harris/Bentley '237 patent was material to the Bentley Patents. (D.I. 607 at ¶¶ 44-45, 97, 99)

- Dr. Harris was President at Nektar from May 2001 to March 2004, during the time frame when factor VIII was the "highest priority molecule" at Nektar, and he "knew everything that was going on" through his direct reports, including Dr. Bentley. (D.I. 607 at ¶¶ 98-99)

- Dr. Harris supervised the named inventors of the Bentley Patents, and he knew he had disclosed the use of large branched PEGs with factor VIII to the named inventors. He "was the site head of the PEGylation business" and technology

16

team leader at Nektar who was likely consulted for issues on the reagent due to his extensive experience with PEG and pegylated reagents. (D.I. 607 at ¶¶ 98-99)

- Dr. Harris received multiple substantive and privileged communications from prosecution counsel and in-house counsel regarding the Bentley Patents, including on the filing dates of the Bentley provisional application and the Bentley non-provisional application. (D.I. 607 at ¶ 98) It is reasonable to infer from this allegation that Dr. Harris reviewed the applications for the Bentley Patents. *Cf. Janssen Pharmaceutica N.V. v. Mylan Pharms., Inc.*, 456 F. Supp. 2d 644, 676 (D.N.J. 2006) (finding, after a bench trial, no substantive involvement in patent prosecution by an individual who did not review the patent applications).

Allegations that Dr. Harris misappropriated Bayer's confidential information and then passed that confidential information along to the named inventors for inclusion in the patent applications are sufficient to support a reasonable inference that Dr. Harris was substantively involved in the prosecution of the Bentley Patents.

In the Bossard action, Bayer's pleading alleges that:

- Dr. Harris is a named inventor on the Harris/Bentley '237 patent, which discloses large branched PEGs having molecular weights up to 100 kDa and includes examples showing pegylation of a protein that includes 1, 2, and 3 PEGs. The non-provisional application leading to the issuance of the Harris/Bentley '237 patent was filed shortly after Dr. Harris' consultation for Bayer ended, and the pleading alleges that the Harris/Bentley '237 patent is based on confidential information Dr. Harris learned from Bayer, including Bayer's discovery of the

17

efficacy of using fewer or branched large PEG molecules on factor VIII. (D.I. 608 at ¶¶ 43-44, 90)

- Dr. Harris was President at Nektar from May 2001 to March 2004, during the time frame when factor VIII was the "highest priority molecule" at Nektar, and he "knew everything that was going on" through his direct reports, including Dr. Bentley. (D.I. 608 at ¶¶ 89, 91)

- Dr. Harris supervised the named inventors of the Bossard Patents, he knew he had disclosed the use of fewer, large PEGs with factor VIII to the named inventors, and this subject matter was used in the Bossard Patents. He "was the site head of the PEGylation business" and technology team leader at Nektar who was likely consulted for issues on the reagent due to his extensive experience with PEG and PEGylated reagents. (D.I. 608 at ¶ 91)

Dr. Harris' alleged disclosure of the subject matter of the Bossard Patents to the named inventors, along with his supervision of those inventors during prosecution, supports an inference that Dr. Harris was substantively involved in the prosecution of the Bossard Patents. Accordingly, Bayer's pleadings adequately allege that Dr. Harris owed a duty of candor to the USPTO.

Plaintiffs' case authorities do not alter the analysis. *Janssen* was decided after a bench trial, and *Summit 6 LLC v. Research in Motion Corp.* addressed motions for judgment as a matter of law following a jury trial. *See Janssen Pharmaceutica N.V. v. Mylan Pharms., Inc.*, 456 F. Supp. 2d 644, 676 (D.N.J. 2006); *Summit 6*, 2013 WL 12124321 (N.D. Tex. June 26, 2013). Accordingly, neither addressed the sufficiency of pleaded allegations regarding the duty of

18

candor. In *Intelli-Check, Inc. v. Tricom Card Technologies, Inc.*, the court addressed the duty of candor in the context of a motion to quash third-party subpoenas issued to two attorneys representing the plaintiff in pending patent litigation. 2005 WL 8175488, at *1 (D.N.J. Nov. 10, 2005). The court determined that the subpoenaed patent litigation attorneys' knowledge of the prosecution of a particular patent application did not subject them to the duty of candor because they neither prepared nor prosecuted the patent application. *Id.* at *3. In contrast, Bayer's Bentley and Bossard pleadings specifically allege that Dr. Harris should have been named as an inventor, but he instead passed his substantive knowledge to the named inventors of the Bentley and Bossard Patents for inclusion in the patent applications.

### B. *Walker Process* Antitrust Claim

Pursuant to the Supreme Court's ruling in *Walker Process*, "maintenance and enforcement of a patent obtained by fraud on the Patent Office may be the basis of an action under § 2 of the Sherman Act." *Walker Process Equip., Inc. v. Food Mach. & Chem. Corp.*, 382 U.S. 172, 173 (1965). The party asserting the *Walker Process* claim must show that "the patentee committed fraud before the PTO, that the fraud caused the patent to issue, and that the patentee enforced the fraudulently procured patent." *In re Lipitor Antitrust Litig.*, 855 F.3d 126, 145 (3d Cir. 2017) (internal citation omitted); *see also TransWeb, LLC v. 3M Innovative Properties Co.*, 812 F.3d 1295, 1306 (Fed. Cir. 2016). The party asserting the *Walker Process* claim must also establish the other elements of a Sherman Act monopolization claim: (1) engagement in predatory or anticompetitive conduct, (2) specific intent to monopolize, and (3) "a dangerous probability of achieving monopoly power." *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 456 (1993).

### 1. Baxalta's knowledge of fraud

Plaintiffs present several arguments in support of their position that Bayer's pleadings do not plausibly allege Baxalta knew it was asserting fraudulently procured patents. Plaintiffs first argue that, because the pleadings fail to state a claim for inequitable conduct, the *Walker Process* counterclaims must be dismissed as to both Baxalta and Nektar. (D.I. 623 at 13; D.I. 626 at 13) But Bayer has sufficiently alleged counterclaims for inequitable conduct for the reasons set forth at § IV.A, *supra. See TransWeb, LLC v. 3M Innovative Properties Co.*, 812 F.3d 1295, 1307 (Fed. Cir. 2016) (observing that "the showing required for proving inequitable conduct and the showing required for proving the fraud component of *Walker Process* liability may be nearly identical."). Therefore, the court turns to the balance of Plaintiffs' arguments regarding whether Baxalta specifically had knowledge of the alleged fraud on the USPTO.

Plaintiffs argue that Baxalta did not itself engage in the alleged fraud or participate in the prosecution of the patents. (D.I. 623 at 13; D.I. 626 at 13) Plaintiffs contend that Baxalta's knowledge of allegations made in a German Entitlement Proceeding regarding European counterparts to the asserted patents is insufficient to state a *Walker Process* claim for fraud on the USPTO, particularly because the German court reached no final decision on the issue. (D.I. 623 at 13-14; D.I. 626 at 13-14) And because the guidance order issued in the German Entitlement Proceeding is dated December 2018, Plaintiffs argue that it cannot form the basis of Baxalta's pre-suit knowledge of fraud in this case. (D.I. 653 at 7) In response, Bayer argues that the German Entitlement Proceeding addressed facts that gave rise to fraud and assessed the credibility of conflicting testimony regarding whether Dr. Harris learned of factor VIII pegylation from Bayer's Dr. Tomic in the 1990's. (D.I. 643 at 11)

Bayer's Bentley and Bossard pleadings indicate that Baxalta had pre-suit knowledge of the alleged fraud as a result of Baxalta's attendance at a 2013 German Entitlement Proceeding, before the instant litigation commenced in 2017. (D.I. 607 at ¶ 168; D.I. 608 at ¶ 158 (citing C.A. No. 16-1122-RGA, D.I. 1 at ¶ 36)) In the German Entitlement Proceeding, Bayer sought co-ownership rights in Nektar's pending European patent filings claiming pegylated recombinant factor VIII compounds that Nektar allegedly obtained through communications from Bayer. (*Id.*) It is therefore plausible that Baxalta would have been on notice of Nektar's purported fraud after attending the proceedings in 2013. "A *Walker Process* claim may be made against a party that knowingly enforces a patent procured by fraud on the PTO, even if that party did not itself prosecute the patent." *Abbott Labs. v. Teva Pharms. USA, Inc.*, 432 F. Supp. 2d 408, 432 (D. Del. 2006) (holding that allegations of the plaintiff's knowledge that the patent was obtained by fraud, combined with its pursuit of litigation against the defendants, were sufficient to support *Walker Process* fraud allegations).

Plaintiffs' reliance on *In re Lipitor Antitrust Litig.*, 868 F.3d 231 (3d Cir. 2017) does not alter the analysis. In *In re Lipitor*, the plaintiffs asserted a *Walker Process* claim based on allegations that Pfizer acquired the asserted patent by fraud on the USPTO. *Id.* at 267. Neither Pfizer nor the district court challenged the sufficiency or the specificity of those allegations under the applicable pleading standards. *Id.* Nonetheless, the district court determined that the *Walker Process* allegations were not plausible because other courts in Australia and Canada had considered the same fraud allegations and determined that they were implausible or unsubstantiated. *Id.* The Third Circuit reversed, concluding that the plausibility of the *Walker*

*Process* allegations should be based on an assessment of the plaintiffs' pleading, and not on foreign rulings that were unfavorable to the plaintiffs' position. *Id.* at 269.

The issue here is not whether Bayer's pleaded allegations are plausible because a German court found those allegations plausible. Instead, the pleaded allegations regarding the German Entitlement Proceeding are relevant because they show that Baxalta was aware of Bayer's assertion that it deserved credit for the discovery of pegylated recombinant factor VIII. In this regard, any conclusions by the German court regarding the merits of Bayer's allegations in the German Entitlement Proceeding are irrelevant to whether Baxalta learned of the alleged fraud in 2013.[10] *In re Lipitor* is also dissimilar because the foreign proceedings were relied on by the district court to refute the plausibility of the plaintiff's pleading. In contrast, Bayer cites Baxalta's attendance at the foreign proceedings in support of its pleaded allegation that Baxalta knew of the fraud when the litigation was filed. (D.I. 607 at ¶ 168; D.I. 608 at ¶ 158) At this

---

[10] Plaintiffs also rely on *FTC v. AbbVie Inc.*, 107 F. Supp. 3d 428, 437-38 (E.D. Pa. 2015), *rev'd on other grounds*, *FTC v. AbbVie Inc.*, 976 F.3d 327 (3d Cir. 2020), for the proposition that a separate but related proceeding cannot form the basis for knowledge when there is no final judicial determination. (D.I. 626 at 14) In that case, the FTC alleged that Teva settled the lawsuit with knowledge that the litigation was groundless, relying on Teva's counterclaim for sham litigation in support and indicating the likelihood that the court would have ruled in Teva's favor on the sham issue. *AbbVie*, 107 F. Supp. 3d at 437. The court rejected the FTC's arguments, noting that no judicial determination of the sham issue had been made when the parties settled, and any speculation about how the court would have ruled was just that—speculation. The court observed that "a party in Teva's position would risk antitrust liability by claiming the underlying action brought against it is baseless and thereafter agreeing to settle," which "would undermine the salutary public policy favoring settlements." *Id.* at 438. The circumstances before the court in this case are not analogous because the inquiry here is whether allegations that Baxalta knew it was asserting allegedly fraudulent patents against Bayer are facially plausible. Bayer's pleadings do not discuss Baxalta's attendance at the 2013 German Entitlement Proceeding to address the merits of Bayer's position before the German court. Instead, they merely show that Baxalta was aware of Bayer's fraud allegations due to its attendance at those proceedings. Nothing more is required to show Baxalta's knowledge of the fraud at the pleadings stage.

stage of the proceedings, the court must credit Bayer's pleaded allegations and draw all

reasonable inferences in favor of Bayer. *See, e.g.*, *Amgen, Inc. v. F. Hoffman-La Roche Ltd.*, 480

F. Supp. 2d 462, 469 (D. Mass. 2007) ("[T]his Court must here take the facts alleged in the

counterclaims in the light most favorable to [the defendant] and draw all inferences in its favor . .

. without expressing any opinion as to the merits of the *Walker Process* claim. . . ."). Because

the 2013 German Entitlement Proceeding addressed Bayer's "co-ownership rights in certain of

Nektar's pending European patent filings concerning pegylated recombinant Factor VIII

compounds and related patents that reflect information Netkar obtained through communications

from Bayer," it is reasonable to infer that Baxalta learned of the alleged fraud during its

observation of those proceedings.

The inference that Baxalta knew of the alleged fraud finds further support in Bayer's

allegations regarding the terms of a 2005 research, development, license and manufacturing and

supply agreement executed between Nektar and Baxalta (the "2005 Agreement"). (D.I. 607 at ¶

166, Ex. AS at 72, 76-78; D.I. 608 at ¶ 156) Bayer's pleadings indicate that the 2005 Agreement

shows Nektar agreed not to narrow claim limitations during prosecution without Baxalta's prior

written consent, and Nektar and Baxalta agreed to jointly enforce the patents and split the

proceeds from enforcement. (*Id.*) Combined with Bayer's assertion that Baxalta and Nektar

exchanged dozens of privileged communications during prosecution of the asserted patents,[11] it

is reasonable to infer that Baxalta learned of the alleged fraud during its collaboration with

---

[11] Plaintiffs allege that Bayer's citation to the privilege log is improper because it requires
drawing an adverse inference based on withheld communications. (D.I. 626 at 15) The case
relied upon by Plaintiffs, *Knorr-Bremse Systeme Fuer Nutzfahrzeuge GmbH v. Dana Corp.*, 383
F.3d 1337, 1344-45 (Fed. Cir. 2004), was a post-trial decision. At this stage of the proceedings,
the number and timing of the communications between Baxalta and Nektar is facially plausible
circumstantial evidence that Baxalta knew of the fraud from its communications with Nektar.

Nektar in the prosecution of the Bentley and Bossard Patents. (D.I. 607 at ¶ 166, Ex. V; D.I. 608 at ¶ 156; D.I. 679 at 22:9-15)

### 2. Nektar's participation in the relevant market

Plaintiffs contend that Bayer has not sufficiently alleged Nektar is a market participant and, therefore, Bayer's monopolization claims against Nektar should be dismissed. (D.I. 623 at 17) According to Plaintiffs, Bayer cannot plead an attempted monopolization claim against Nektar by alleging that Nektar collaborated with Baxalta because attempted monopolization proscribes only unilateral conduct. (*Id.* at 18) Plaintiffs argue that Nektar's role as the supplier of the excipient PEG used to make Adynovate® and its voting rights as to R&D and clinical trials do not transform Nektar into a market participant in the finished drug product market. (*Id.* at 18-19)

In response, Bayer first argues that Plaintiffs are improperly asserting a motion for reconsideration of the court's Memorandum Opinion and Order granting Bayer's motion for leave to amend, which concluded that the *Walker Process* claims were sufficiently pleaded and were not futile. (D.I. 643 at 10; D.I. 604 at 11-12) The Memorandum Opinion and Order rejected Plaintiffs' argument that amendment would be futile because allegations of Baxalta's knowledge and Nektar's market participation were inadequate. (D.I. 604 at 11-12; D.I. 547 at 16-17) An amendment is futile if it "would fail to state a claim upon which relief could be granted." *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1434 (3d Cir. 1997). The futility analysis follows the standard that applies to a motion under Rule 12(b)(6). *Id.* Accordingly, this issue has already been decided.

24

Bayer further contends that Nektar jointly developed Adynovate® with Baxalta and it

supplies the key PEG in the product. (D.I. 643 at 13) Without Nektar's contributions, Bayer

alleges that there would be no Adynovate® manufacturing. (*Id.*) Bayer contends that Nektar's

50% voting power over R&D and clinical trials and its receipt of 4-13% of Adynovate® net sales

show that Nektar is more than an arm's length component supplier. (*Id.*) According to Bayer,

Nektar's agreement to jointly maintain and enforce patents obtained by fraud was done to protect

Adynovate's market share. (*Id.* at 14) In this regard, Bayer alleges that Baxalta and Nektar are

alleged to act as a single entity. (*Id.* at 14-15)

Viewing the Bentley and Bossard pleadings in the light most favorable to Bayer as the

nonmoving party, Bayer's pleadings plausibly allege that Nektar was a market participant. The

pleadings allege that Nektar jointly developed Adynovate® with Baxalta, that Nektar supplies

the PEG in Adynovate®, that Nektar receives 4-13% of Adynovate® net sales, that Nektar has

50% voting power over R&D and clinical trials, and that Nektar jointly enforces the fraudulent

patents and splits the proceeds of any infringement award with Baxalta. (D.I. 607 at ¶¶ 70, 166,

169; D.I. 608 at ¶¶ 73, 156, 159) These allegations are sufficient to show that Nektar worked

together with Baxalta as a single entity to obtain and enforce the patents. *See Abbott Labs.*, 432

F. Supp. 2d at 432 (upholding *Walker Process* claim against both Abbott, the seller, and

Fournier, the licensor).

Bayer contends that its pleadings also adequately allege conspiracy to monopolize under

Section 2 of the Sherman Act. (D.I. 643 at 15) In reply, Plaintiffs contend that Bayer never

asserted this theory before, and the pleadings do not reference the terms "conspire" or

"conspiracy." (D.I. 653 at 9) In the event that the court considers the merits of Bayer's position,

Plaintiffs argue that the pleadings do not allege past or present anticompetitive effects from

Plaintiffs' alleged conduct. (*Id.*)

To state a claim for conspiracy to monopolize under Section 2 of the Sherman Act, Bayer

must allege: "(1) an agreement to monopolize; (2) an overt act in furtherance of the conspiracy;

(3) a specific intent to monopolize; and (4) a causal connection between the conspiracy and the

injury alleged." *Wallach v. Eaton Corp.*, 814 F. Supp. 2d 428, 441 (D. Del. 2011) (quoting

*Howard Hess Dental Labs. Inc. v. Dentsply Int'l, Inc.*, 602 F.3d 237, 253 (3d Cir. 2010)).  Bayer

acknowledges that the pleadings do not expressly recite the phrase "conspiracy to monopolize,"

but the pleadings otherwise satisfy the four elements because (1) the 2005 Agreement

demonstrates Nektar and Baxalta's agreement to monopolize (D.I. 607 at ¶ 69; D.I. 608 at ¶ 66);

(2) Plaintiffs filed suit against Bayer pursuant to the 2005 Agreement in furtherance of the

conspiracy (*id.*); (3) Plaintiffs' lawsuit based on the fraudulently-obtained Bentley and Bossard

Patents show Plaintiffs' specific intent to monopolize (D.I. 607 at ¶ 177; D.I. 608 at ¶ 168); and

(4) Plaintiffs' abuse of the legal process in suing Bayer amounts to a causal connection between

the conspiracy and the injury (D.I. 607 at ¶¶ 170-71, 180; D.I. 608 at ¶¶ 160-61, 170).  (D.I. 643

at 15-16)  Drawing all reasonable inferences in favor of Bayer, the pleaded allegations plausibly

set forth factual allegations to satisfy each element of a cause of action for conspiracy to

monopolize under Section 2.

Plaintiffs argue that Bayer's conspiracy to monopolize allegations do not identify a past

or present anticompetitive effect, but the case law cited by Plaintiffs does not support such a

requirement. *See, e.g.*, *Dickson v. Microsoft Corp.*, 309 F.3d 193, 211 (4th Cir. 2002) ("[A]

viable § 2 conspiracy to monopolize claim must include allegations which, if proven true, would

establish that the agreements . . . could have had an anticompetitive effect." (citing *U.S. Anchor Mfg., Inc. v. Rule Indus., Inc.*, 7 F.3d 986, 1001 (11th Cir. 1993) (listing the likelihood of an anticompetitive effect as one of the elements of a conspiracy to monopolize under § 2))). In fact, the Federal Circuit has confirmed that an anticipated future anticompetitive effect that never actually materializes is actionable. *See TransWeb, LLC v. 3M Innovative Properties Co.*, 812 F.3d 1295, 1309 (Fed. Cir. 2016) (awarding damages in the form of attorney's fees upon concluding that "3M's unlawful act [in bringing suit on a fraudulently obtained patent] was in fact aimed at reducing competition and would have done so had the suit been successful."). The Bentley and Bossard pleadings sufficiently allege that Plaintiffs are likely to achieve monopoly power by engaging in this lawsuit and using the fraudulently obtained Bentley and Bossard Patents to obtain licenses. (D.I. 607 at ¶ 170; D.I. 608 at ¶ 160)

Moreover, the pleadings allege past and present anticompetitive harm in the form of attorney fees incurred in litigating this suit. (D.I. 607 at ¶¶ 171, 180; D.I. 608 at ¶¶ 161, 170) As the Federal Circuit has stated in allowing attorney fees as antitrust damages on a *Walker Process* claim, "it is the *abuse of the legal process* by the antitrust-defendant that makes the attorney fees incurred by the antitrust-plaintiff during that  legal process a relevant antitrust injury." *TransWeb*, 812 F.3d at 1312 (emphasis in original). In reaching this conclusion, the *TransWeb* court dismissed 3M's argument that attorney fees had no effect on competition, did not force TransWeb out of the market, or otherwise affected prices in the market. *Id.* at 1309. The Federal Circuit explained its rationale for treating attorney fees as an antitrust injury as follows:

> [T]he patentee instigated an anticompetitive suit that forced the defendant to choose between ceasing competition, taking a disadvantageous position in competition (taking a license), or defending the suit. Because the injury suffered

27

by the antitrust-plaintiff under each choice flows from the anticompetitive aspect of the patent owner's behavior, each can be recovered as antitrust damages.

*Id.* at 1310.

### 3. Dangerous probability of success of monopolization

Plaintiffs contend that Bayer's allegations of attempted monopolization do not adequately address a dangerous probability of each Plaintiff to successfully achieve monopoly power because there are at least five competitive products currently on the market. (D.I. 623 at 15-16) According to Plaintiffs, Bayer's pleadings do not allege that Plaintiffs have achieved at least a 50% market share, let alone establish a dangerous probability of monopolization. (*Id.* at 17)

In response, Bayer contends that Plaintiffs' arguments are fact-intensive and cannot be resolved on a motion to dismiss. (D.I. 643 at 16) Specifically, Bayer argues that disputes about which products are in the market, which firms control which products, when products entered or exited the market, switching data, and market share percentages for any products cannot be resolved at this stage of the proceedings. (*Id.*) Bayer challenges Plaintiffs' argument that Bayer must plead at least a 50% market share, citing authority denying a motion for summary judgment based on a particular market share alone, and noting that a 35% market share may be sufficient to demonstrate a dangerous probability of success. (*Id.* at 17)

At this stage of the proceedings, Bayer has adequately alleged a dangerous probability that Plaintiffs will achieve monopoly power in the relevant market. (D.I. 607 at ¶ 169; D.I. 608 at ¶ 159) "In a determination of dangerous probability ... factors such as significant market share coupled with anticompetitive practices, barriers to entry, the strength of competition, the probable development of the industry, and the elasticity of consumer demand may be considered. No single factor is dispositive." *Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297, 318 (3d Cir.

28

2007) (internal citation omitted); *see also id.* ("Courts typically should not resolve this question at the pleading stage unless it is clear on the fact of the complaint that the dangerous probability standard cannot be met as a matter of law.") (internal quotation marks omitted).  Plaintiffs' arguments regarding the number of competitors in the relevant market and their comparative market shares are not appropriately resolved on a motion to dismiss, when the pleaded allegations must be viewed in the light most favorable to Bayer as the nonmoving party.

### C.  Unclean Hands

Because Bayer's unclean hands allegations rest on the same allegations as the inequitable conduct counterclaims, I recommend that the court deny Plaintiffs' motions to the extent that they seek dismissal of Bayer's counterclaims for unclean hands.

### D.  Affirmative Defenses

I recommend that the court deny Plaintiffs' motion to strike Bayer's affirmative defenses for the same reasons and to the same extent as set forth at § IV.A-C, *supra*.  The sufficiency of the affirmative defenses is evaluated under Rule 12(f), which provides that the court "may strike from a pleading any insufficient defense."  Fed. R. Civ. P. 12(f).  When a party fails to state a corresponding claim under Rule 12(b)(6), the court may strike the associated affirmative defense under Rule 12(f).  *See Wyeth Holdings Corp. v. Sandoz, Inc.*, C.A. No. 09-955-LPS-CJB, 2012 WL 600715, at *4 (D. Del. Feb. 3, 2012) (citing *Power Integrations, Inc. v. Fairchild Semiconductor Int'l Inc.*, C.A. No. 08-309-JJF-LPS, 2009 WL 4928024, at *8-10 (D. Del. Dec. 18, 2009)).  Because Bayer's inequitable conduct affirmative defenses rise and fall with its inequitable conduct counterclaims, *see Senju Pharm. Co., Ltd. v. Apotex, Inc.*, 921 F. Supp. 2d

29

297, 306 (D. Del. 2013), I recommend that the court deny Plaintiffs' motion to strike the affirmative defenses.

## V.   CONCLUSION

For the foregoing reasons, I recommend that the court DENY Plaintiffs' motions to dismiss Bayer's inequitable conduct, unclean hands, and *Walker Process* antitrust counterclaims, and DENY Plaintiffs' corresponding motions to strike Bayer's affirmative defenses.  (D.I. 622; D.I. 625)

Given that the court has relied upon material that technically remains under seal, the court is releasing this Report and Recommendation under seal, pending review by the parties.  In the unlikely event that the parties believe that certain material in this Report and Recommendation should be redacted, the parties shall jointly submit a proposed redacted version by no later than **April 29, 2021**, for review by the court, along with a motion supported by a declaration that includes a clear, factually detailed explanation as to why disclosure of any proposed redacted material would "work a clearly defined and serious injury to the party seeking closure."  *See In re Avandia Mktg., Sales Practices & Prods. Liab. Litig.*, 924 F.3d 662, 672 (3d Cir. 2019) (quoting *Miller v. Ind. Hosp.*, 16 F.3d 549, 551 (3d Cir. 1994) (internal quotation marks omitted)).  If the parties do not file a proposed redacted version and corresponding motion, or if the court determines the motion lacks a meritorious basis, the documents will be unsealed within thirty (30) days of the date the Report and Recommendation issued.

This Report and Recommendation is filed pursuant to 28 U.S.C. § 636(b)(1)(B), Fed. R. Civ. P. 72(b)(1), and D. Del. LR 72.1.  The parties may serve and file specific written objections within fourteen (14) days after being served with a copy of this Report and Recommendation.

Fed. R. Civ. P. 72(b)(2). The objection and responses to the objections are limited to ten (10) pages each. The failure of a party to object to legal conclusions may result in the loss of the right to de novo review in the District Court. *See Sincavage v. Barnhart*, 171 F. App'x 924, 925 n.1 (3d Cir. 2006); *Henderson v. Carlson*, 812 F.2d 874, 878-79 (3d Cir. 1987).

The parties are directed to the court's Standing Order For Objections Filed Under Fed. R. Civ. P. 72, dated October 9, 2013, a copy of which is available on the court's website, http://www.ded.uscourts.gov.

Dated: April 22, 2021

Sherry R. Fallon
United States Magistrate Judge

31